THE PEOPLE OF THE STATE OF NEW YORK ex rel. JOHN J. GRIFFIN, Appellant, *v.* AUSTIN LATHROP, Superintendent of State Prisons, and WILLIAM R. BROWN, Agent and Warden of Sing Sing Prison, Respondents.

*The State prisons — power of the wardens to appoint and remove their subordinates — honorably discharged Union soldiers.*

The power conferred upon the wardens of the State prisons by section 4 of article 5 of the Constitution of the State of New York, to appoint officers of their respective prisons, subject to the approval of the Superintendent of State Prisons, is subject to regulation and control by the Legislature.

The power conferred upon the wardens of the State prisons by subdivision 2 of section 30 of chapter 382 of the Laws of 1889, to remove subordinate officers and employees appointed by them with the approval of the Superintendent of State Prisons, must not be exercised for political or personal or merely arbitrary reasons, but wholly for the efficiency of that branch of the public service.

To the extent of being empowered to remove subordinate officers and employees for the good of the service, in the honest exercise of sound discretion, the wardens of the State prisons are relieved by the act of 1889 from the force of acts prior to 1889 in relation to the appointment and removal of honorably discharged Union soldiers and sailors in the public departments of the State of New York; but, subject to this broad discretion, the wardens are bound to give preference to such soldiers and sailors in cases otherwise evenly balanced.

The fact that a duly appointed keeper in a State prison is an honorably discharged Union soldier does not give him a vested right in his office, and he may be removed therefrom by the warden, in an honest exercise of discretion, for the good of the prison service.

The wardens of the State prisons are responsible to the criminal authorities for the discharge of their duty in the appointment and removal of subordinates; and the question may be reviewed also by the courts in a proceeding for mandamus.

APPEAL by the relator, John J. Griffin, from an order made at Special Term and entered in the office of the clerk of Westchester county on the 31st day of December, 1892, denying the relator's motion for a peremptory writ of mandamus directing the respondents to reinstate the relator as a keeper in Sing Sing State prison.

The relator, an honorably discharged Union soldier, on or about March 8, 1866, was appointed guard at Sing Sing prison, and continued as such until April 1, 1869. July 25, 1873, he was appointed keeper, and held that position until 1879. October 1, 1879, relator was again appointed guard. April 1, 1880, he was promoted to the position of keeper, and held that position continuously

until September 25, 1891. On the day last named the relator was relieved of duty by the agent and warden. At the time of the discharge relator gave notice to the agent and warden that he, relator, was an honorably discharged soldier, and as such claimed preference and continuance in employment as such, and after such notice the agent and warden discharged the relator. The agent and warden of Sing Sing prison filed an affidavit alleging his appointment as such officer under the provisions of section 4, article 5 of the Constitution, and that the removal of relator was made by him by the direction and approval of the Superintendent of State Prisons, by virtue of the power granted to so remove, by the Constitution of this State. Relator applied for a writ of peremptory mandamus to compel his reinstatement, and a hearing was had thereon at Poughkeepsie Special Term, September 24, 1892, and the application was denied, whereupon the relator appealed to the General Term.

Section 4 of article 5 of the Constitution of the State of New York contains the following provisions: "A Superintendent of State Prisons shall be appointed by the Governor, by and with the advice and consent of the Senate; * * * he shall have the superintendence, management and control of State prisons, subject to such laws as now exist or may hereafter be enacted; he shall appoint the agents, wardens, physicians and chaplains of the prisons. The agent and warden of each prison shall appoint all other officers of such prison, except the clerk, subject to the approval of the same by the Superintendent. The Comptroller shall appoint the clerks of the prisons. The Superintendent shall have all the powers and perform all the duties not inconsistent herewith, which have heretofore been had and performed by the Inspectors of State Prisons; * * # "

Section 30 of chapter 382 of the Laws of 1889, entitled "An act to amend title 2 of chapter 3 of part 4 of the Revised Statutes, relating to State prisons and for other purposes connected therewith," contains the following provisions: "§ 30. The Superintendent of State Prisons shall appoint the agent and warden, physician and chaplain of each of the said prisons, as provided in the Constitution; and he may remove them from office whenever in his judgment the public interests shall so require. He shall designate such number of keepers, guards, teachers and other employees at each of

said prisons as he may deem necessary for the safe-keeping and improvement of the prisoners or for the maintenance of discipline, and he shall also designate which of them shall reside at the prison.  *  *  *

"2. The agent and warden of each of said prisons shall appoint, subject to the approval of the Superintendent of State Prisons, a principal keeper, a store keeper, a kitchen-keeper, a hall-keeper, a yard-keeper, a sergeant of the guard, and so many other keepers, guards, teachers and employees of such prison as shall be designated by the Superintendent of State Prisons as aforesaid, and such agent and warden shall have the power to remove such subordinate officers and employees so appointed by him.

"3. No appointment shall be made in any of the State prisons of this State on the grounds of political partisanship; but honesty, capacity and adaptation shall constitute the rule for appointments, and any violation of this rule shall be sufficient cause for the removal from office of the officer committing such violation.  *  *  *  "

The legislation in reference to the appointment and removal of honorably discharged Union soldiers and sailors in the public departments of the State of New York is to be found in chapters 312 and 410 of the Laws of 1884, chapter 29 of the Laws of 1886, and chapter 464 of the Laws of 1887.

*Horace D. Ellsworth*, for the relator.

*S. W. Rosendale*, Attorney-General, and *John W. Hogan*, Deputy Attorney-General, for the respondents.

Pratt, J.:

The points involved in this case gravely affect the public service, and we assume that they will be submitted to the Court of Appeals. Perhaps the ends of justice might be served quite as well, if, under these circumstances, we merely announced our conclusion without any opinion. But we, nevertheless, briefly state our view.

The Constitution (§ 4, art. 5) undoubtedly vests the superintendence, management and control of the State prisons in the Superintendent of State Prisons, but that management and control is "subject to such laws as now exist or may hereafter be enacted."

Hence, the superintendent is certainly subject to the action of the Legislature in the exercise of their "management and control." The warden is to be appointed by the superintendent. True, the Constitution does not say that the warden is subject to the control of the Legislature, but *his power* of appointment is subject to the "approval of the same by the superintendent." It is plainly subordinate to the superintendent, and it would be singular indeed if the warden is not bound to obey the letter and spirit of a statute which his superior is bound to observe.

We find nothing necessarily inconsistent between the act of 1889 (Chap. 382), and prior statutes, so far as they bear on the point here involved. The only difficulty is in their application. The warden's power of removal from office must not, in our judgment, be exercised for mere political or personal or other arbitrary reasons; but wholly for the efficiency of this branch of the public service.

The warden is undoubtedly vested with a most important trust. His employees must be men of great skill in judging of men, particularly those who become prisoners, and, above all, men of absolute loyalty, courage, coolness and bravery, nerve, as it is sometimes expressed. It is not according to our experience that these qualities are always found in the people who are most proficient in geography, or arithmetic or any other acquirement of that character. Hence, the widest latitude was needed and was extended by the act of 1889, in this case to the warden, and to that extent he was relieved from the force of acts prior to 1889. But, subject to this broad discretion, we think he was bound to give preference to honorably discharged Union soldiers and sailors in cases otherwise evenly balanced. But it must be observed that the discretion is *so* broad that it is difficult to determine judicially just where this officer may err in one direction or the other. It was and is undoubtedly a question of fact whether he acted within the line of his duty in this case — that is to say, that whether or not his honest judgment was that the public interests required the removal of this relator. If he so honestly judged, I do not see why we should, or how we can, lawfully interfere. It would undoubtedly be our duty to determine, in a proper case, whether or not he acted honestly or dishonestly in the premises; but we see no fair reason to question his action in that regard in this case.

It was natural that the relator should think that his removal was attributable to purely political considerations. But that is a mere conclusion at best, and is scarcely supported by sufficient evidence. Besides that, the allegation is denied by the warden, who says that he acted solely for the good of the service. The relator may have been, and doubtless was, an excellent man, one wholly satisfactory in general ways ; but what if the warden should discover that there was at his service another man of pre-eminent ability, whose skill and service he could secure in this department of the public service ? Can there be any doubt, in view of this statute, that the warden would be authorized to secure his services even at the expense of creating a vacancy for that purpose? We think not. The public interest in that case might require a removal of the least efficient, though perhaps fair man, as means of greater efficiency, for that matter is always relative. It will be thus seen that we do not accept this proposition that the relator's office gave him a vested right in the office which he might hold as his property. The efficiency of the service is the controlling consideration. The relator held his place subject to the warden's judgment of the public interest, to be honestly exercised. We see no reason to disturb the judgment of the learned judge at Special Term on this question of fact.

The warden is doubtless responsible to the criminal authorities for his discharge of this duty. So, too, we think that a court in such a proceeding as this may review that question, but we do not see that the relator has placed himself in a position where we can help him in that particular now.

We, therefore, affirm the order.

DYKMAN, J., concurred ; BARNARD, P. J., not sitting.

Order denying writ of mandamus affirmed.